# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA
U.S. Department of Justice
Antitrust Division
450 Fifth Street, N.W., Suite 4000
Washington, DC 20530,

STATE OF ARIZONA
Office of the Attorney General
1275 West Washington
Phoenix, AZ  85007,

STATE OF ARKANSAS
Office of the Attorney General
323 Center Street, Suite 200
Little Rock, AR  72201,

STATE OF CALIFORNIA
California Office of the Attorney General
300 So. Spring Street, Suite 1702
Los Angeles, CA  90013,

STATE OF FLORIDA
Office of the Attorney General
Antitrust Division
PL-01; The Capitol
Tallahassee, FL  32399-1050,

STATE OF ILLINOIS
Office of the Attorney General
100 West Randolph Street
Chicago, IL  60601,

STATE OF IOWA
Iowa Department of Justice
Hoover Office Building-Second Floor
1305 East Walnut Street
Des Moines, IA 50319,

STATE OF LOUISIANA
Public Protection Division
1885 North Third St.
Baton Rouge, LA 70802

COMMONWEALTH OF
MASSACHUSETTS
Office of Attorney General Martha Coakley
One Ashburton Place
Boston, MA 02108,

STATE OF NEBRASKA
Nebraska Department of Justice
2115 State Capitol
Lincoln, NE 68509,

STATE OF NEVADA
Office of the Attorney General
Bureau of Consumer Protection
555 E. Washington Ave., Suite 3900
Las Vegas, NV 89101,

STATE OF OHIO
Office of Ohio Attorney General Richard
Cordray
150 E. Gay St., 23rd Fl.
Columbus, OH 43215,

STATE OF OREGON
Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301-4096,

COMMONWEALTH OF PENNSYLVANIA
Office of Attorney General
Antitrust Section
14th Floor Strawberry Square
Harrisburg, PA  17120,


STATE OF RHODE ISLAND
Office of the Attorney General
150 South Main Street
Providence, RI  02903,


STATE OF TENNESSEE
Office of the Attorney General and Reporter
425 Fifth Avenue North
Nashville, TN  37243,


STATE OF TEXAS
Office of the Attorney General
300 W. 15th Street
Austin, TX  78701

and

STATE OF WISCONSIN
Wisconsin Department of Justice
17 West Main Street
Madison, WI  53707,

                    *Plaintiffs,*

        v.


TICKETMASTER ENTERTAINMENT,
INC.
8800 West Sunset Boulevard
West Hollywood, CA 90069,

and

LIVE NATION, INC.
9348 Civic Center Drive
Beverly Hills, CA 90210,

           *Defendants.*

---

## COMPLAINT

The United States of America, acting under the direction of the Attorney General of the United States, and the States of Arizona, Arkansas, California, Florida, Illinois, Iowa, Louisiana, Nebraska, Nevada, Ohio, Oregon, Rhode Island, Tennessee, Texas, and Wisconsin, and the Commonwealths of Massachusetts and Pennsylvania, acting under the direction of their respective Attorneys General or other authorized officials ("Plaintiff States") (collectively, "Plaintiffs"), bring this civil action pursuant to the antitrust laws of the United States to enjoin the proposed merger of Ticketmaster Entertainment, Inc. ("Ticketmaster") and Live Nation, Inc. ("Live Nation") and to obtain such other equitable relief as the Court deems appropriate. The United States and the Plaintiff States allege as follows:

## I. INTRODUCTION

1.    This lawsuit challenges a proposed merger between Ticketmaster and Live Nation. If not enjoined, the merger will eliminate competition between the companies in the line of commerce of the provision of primary ticketing services ("primary ticketing") to major concert venues in the United States, in violation of Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18.

2.    For over two decades, Ticketmaster has been the dominant primary ticketing service provider in the United States to, among others, major concert venues. Primary ticketing,

4

the initial distribution of tickets, has been highly profitable for Ticketmaster. Ticketmaster charges a variety of service fees, which are added to the face value of the ticket. Ticketmaster typically shares a percentage of the money from some of these fees with venues. In 2008, Ticketmaster's share among major concert venues exceeded eighty percent and its revenues from primary ticketing were much greater than that of its nearest competitor. Ticketmaster's contract renewal rate with venues typically exceeds eighty-five percent.

3.     Live Nation is the country's largest concert promoter. It also controls over seventy-five concert venues in the United States, including many major amphitheaters. Live Nation had been Ticketmaster's largest primary ticketing client for a number of years. In 2007, however, Live Nation announced that it would not renew its contract with Ticketmaster. Instead, Live Nation would become Ticketmaster's direct competitor in primary ticketing when its Ticketmaster contract expired on December 31, 2008. After spending nearly two years evaluating, licensing, and developing a ticketing platform, in late December 2008, Live Nation launched its ticketing service for its own venues and potential third-party major concert venue clients.

4.     Live Nation presented a new and different source of competition in primary ticketing. As a concert promoter, Live Nation could offer venues access to concert tours as an inducement to use Live Nation's ticketing service. Ticketmaster had no concert promotion business. In contrast, as both a venue owner and a concert promoter, Live Nation had economic incentives to reduce service fees on tickets in order to fill more seats and earn the associated ancillary revenue from doing so.

5

5.      Entrants face substantial hurdles in the form of Ticketmaster's economies of scale, long-term contracts, and brand recognition as well as the technological hurdles necessary to compete in primary ticketing.  Live Nation had overcome many of these by virtue of its position in promotion and venue operation and the two years it had devoted to building a ticketing platform.

6.      On February 10, 2009, Ticketmaster and Live Nation announced their plans to merge.  The merger would eliminate head-to-head competition between Ticketmaster and Live Nation in the provision of primary ticketing services.  Unless remedied, the merger between Ticketmaster and Live Nation would substantially lessen competition for the provision of primary ticketing services in the United States in violation of Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18.

7.      Thus, the United States and the Plaintiff States ask this Court to enjoin this proposed merger.

## II. JURISDICTION AND VENUE

8.      The United States brings this action under Section 15 of the Clayton Act, as amended, 15 U.S.C. § 25, to prevent and restrain Ticketmaster and Live Nation from violating Section 7 of the Clayton Act, 15 U.S.C. § 18.

9.      The Plaintiff States, by and through their respective Attorneys General and other authorized officials, bring this action under Section 16 of the Clayton Act, 15 U.S.C. § 26, to prevent and restrain Ticketmaster and Live Nation from violating Section 7 of the Clayton Act, 15 U.S.C. § 18.  The Plaintiff States bring this action in their sovereign capacities and as *parens patriae* on behalf of the citizens, general welfare, and economy of each of their states.

10.     Ticketmaster and Live Nation provide and sell primary ticketing services to major concert venues in the flow of interstate commerce. Ticketmaster's and Live Nation's activities in providing and selling primary ticketing services to major concert venues substantially affect interstate commerce as well as commerce in each of the Plaintiff States. This Court has subject matter jurisdiction over this action and these defendants pursuant to Section 15 of the Clayton Act, as amended, 15 U.S.C. § 25, and 28 U.S.C. §§ 1331, 1337(a), and 1345.

11.     Venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391(b)(1), (c). Defendants Ticketmaster and Live Nation transact business and are found within this District.

## III. PARTIES AND THE PROPOSED MERGER

12.     Ticketmaster is a Delaware corporation headquartered in West Hollywood, California. It is the largest provider of primary ticketing to major concert venues and others in the United States and the world. In 2008, Ticketmaster sold more than 141 million tickets valued at over $8.9 billion on behalf of more than 10,000 clients worldwide and earned approximately $1.4 billion in gross revenues. Ticketmaster also owns a majority interest in Front Line Management Group, Inc., the largest artist management group in the country.

13.     Live Nation is a Delaware corporation headquartered in Beverly Hills, California. It is the world's largest promoter of live concerts, with 2008 worldwide gross revenues of over $4 billion. Live Nation's North American Music business principally involves the promotion of live music events at Live Nation owned and/or operated venues and in rented third-party venues primarily in the United States and Canada. Live Nation also owns or operates over seventy-five

live entertainment venues of various sizes in the United States. This includes eleven House of Blues ("HOB") venues around the country.

14.     On February 10, 2009, Live Nation and Ticketmaster entered into a definitive merger agreement providing for an all-stock "merger of equals" transaction with a combined estimated enterprise value of $2.5 billion.

## IV. BACKGROUND

### A. The Live Music Entertainment Industry

15.     The components of the live music entertainment industry pertinent to this case are:



16.     An artist manager serves as the "CEO" of a performer's business activities, advising in some or all phases of the performer's professional life (tours, appearances, recording deals, movies, advertising, etc.). Managers often are compensated based on a share of the performer's revenues or profits.

17.     The artist manager often hires booking agents to assist in arranging a concert event or tour. The manager or booking agent contracts with promoters, such as Live Nation. Under such contracts, the promoter typically receives the proceeds from gross ticket receipts and then pays the performer, venue, and other expenses associated with the event. For example, the promoter generally contracts with the venue (or uses its own venues), arranges for local production services, and advertises and markets the concert. The promoter bears the downside risk of an event if tickets sell poorly and reaps the upside benefit if tickets sell well.

8

18.     Venue operators provide the facilities where the events will be held and often many of the associated services, such as concessions, parking, and security. Venues traditionally receive a fixed fee for hosting an event as well as proceeds from concessions, parking, and a share of merchandise sales (which may be controlled by the performer or promoter).

19.     Ticketing companies such as Ticketmaster arrange with venues — and at times promoters — to provide primary ticketing services. They are responsible for distributing primary ticket inventory through channels such as the Internet, call centers, and retail outlets and for enabling the venue to sell tickets at its box office. The ticketing company provides the technology infrastructure for distribution. Primary ticketing firms also may provide technology and hardware that allow venues to manage fan entry at the event, including everything from handheld scanners that ushers use to check fans' tickets to the bar codes on the tickets themselves. In some cases, primary ticketing services are provided by the venue itself.

20.     The overall price a consumer pays for a ticket generally includes the face value of the ticket and a variety of service fees above the face value of the ticket. Such fees are most often charged by the provider of primary ticketing services. Venues generally receive a split of the money from ticket service fees. Often described as "convenience," "processing," and "delivery" fees, these service fees can constitute a substantial portion of the overall cost of the ticket to the consumer.

### B. Ticketmaster Dominates Primary Ticketing

21.     Ticketmaster has dominated primary ticketing, including primary ticketing for major concert venues, for over two decades. It derives substantial revenues from ticketing for venues that host major concerts. Other companies seek to compete against Ticketmaster for

9

primary ticketing to major concert venues, but none has been particularly successful. In fact, no

other competitor (other than Live Nation) has more than a four percent share, while in 2008

Ticketmaster's share exceeded eighty percent among major concert venues. Plaintiffs have

focused on the top 500 revenue generating venues in the United States as reported by Pollstar

(referred to in this Complaint as "major concert venues"). Pollstar is a widely used third-party

service that collects information on ticket sales. The pie chart below shows primary ticketers'

shares of major concert venues, based on seating capacity:

### Pre-Live Nation Entry
### Share of Venue Capacity



22.     High shares are not the only indicators of Ticketmaster's dominance.

Ticketmaster's revenues are much greater than those of the next several largest primary ticketing

service competitors (other than Live Nation). Moreover, while other primary ticketing

competitors do compete against Ticketmaster for primary ticketing rights at venues, Ticketmaster

has had very high renewal rates.

23.      Ticketmaster's costs for distributing a ticket have been decreasing as consumers increasingly purchase tickets through the Internet.  The cost-per-ticket to Ticketmaster for tickets sold through its website is significantly lower than the cost-per-ticket to Ticketmaster for tickets sold over the telephone or at a retail outlet.  However, ticketing fees retained by Ticketmaster have not fallen as its distribution costs have declined.

### C. Live Nation Decides to Enter Primary Ticketing

24.      Prior to entering into primary ticketing, Live Nation had been using Ticketmaster as its primary ticketing provider for its venues and was Ticketmaster's largest customer.  In late 2006, Live Nation concluded that it was unlikely to renew the Ticketmaster contract.  Live Nation began considering other options for its primary ticketing needs, including operating its own primary ticketing business to ticket its own venues and to expand the service to third-party venues.

25.      On Dec. 20, 2007, Live Nation announced an agreement with CTS Eventim ("CTS"), the leading German primary ticketing provider.  Under the agreement, Live Nation would use CTS technology to provide primary ticketing services to Live Nation's venues as well as third-party venues in the United States.

### D. Live Nation Was a Competitive Threat to Ticketmaster

26.      As a promoter, Live Nation's relationships with many third-party venues gave it the ability to offer third-party venues access to content.  Live Nation believed that its prominence in promotions would give it immediate credibility in primary ticketing.

27.      Live Nation was in a position to challenge Ticketmaster's dominance in primary ticketing due to its control of venues.  Live Nation selects the primary ticketing provider for over

11

seventy-five live entertainment venues in the United States and had been Ticketmaster's largest customer.

28.     Live Nation also expected to compete on price with Ticketmaster. According to Live Nation, its concert promotion business operated on small margins, while Ticketmaster's margins from ticketing were substantially higher. Thus, entry into primary ticketing created an opportunity for Live Nation to increase its overall profit margin and disrupt Ticketmaster's business model by lowering service fees.

### E.  Live Nation Enters Primary Ticketing

29.     Live Nation's strategy was to launch Live Nation ticketing for its own venues in 2008, and then in late 2009 and early 2010 seek to compete for third-party ticketing contracts.

30.     Even before launching its ticketing platform, however, Live Nation began competing with Ticketmaster to win primary ticketing contracts for third-party venues. In September 2008, Live Nation signed a multi-year ticketing agreement with SMG, the world's largest venue management company, whereby it would have certain rights to ticket SMG-managed venues as each venue's Ticketmaster contract ended.

31.     Using its promotion business as a stepping stone, Live Nation also began competing with Ticketmaster for the primary ticketing contracts for other venues. This was met with some early successes. For example, in October 2008, Live Nation won the ticketing contract at the Roseland Ballroom in New York City.

32.     Live Nation began selling tickets for its own and third-party venues on December 22, 2008. Almost overnight, Live Nation became the second-largest provider of primary ticketing in the United States.

33.     On February 10, 2009, Live Nation and Ticketmaster entered into a definitive merger agreement.

34.     Live Nation has sold millions of tickets using the CTS system. The pie chart below shows primary ticketers' shares of major concert venues, based on seating capacity, following Live Nation's entry into primary ticketing.





## V. RELEVANT MARKET

35.     Primary ticketing services are sold pursuant to terms individually negotiated with customers. The customers most directly and adversely affected by the merger are major concert venues, which generate substantial income from live music events. Major concert venues that generate substantial income from live music events can be readily identified, and market power can be selectively exercised against them, because there is no reasonable substitute service to which the customers could turn. Nor can these customers engage in arbitrage. The provision of primary ticketing services to major concert venues is a relevant price discrimination market and

"line of commerce" within the meaning of Section 7 of the Clayton Act. *See* U.S. Dep't of Justice, Horizontal Merger Guidelines § 1.12 (1997).

36.    The United States is the relevant geographic scope of the market. Major concert venues purchasing primary ticketing services are located throughout the United States.

## VI. ANTICOMPETITIVE EFFECTS

37.    A combination of Ticketmaster and Live Nation would lead to a high share among providers of primary ticketing for major concert venues. The set of customers most likely to be affected by the merger of Ticketmaster and Live Nation are major concert venues. Ticketmaster has the vast share of this primary ticketing business. As described in the pie chart in ¶ 21, before Live Nation entered primary ticketing, Ticketmaster had an eighty-two percent share. The next largest share was Tickets.com at less than four percent. As depicted in the pie chart in ¶ 34, with Live Nation ticketing its own venues and some third-party venues, Ticketmaster's share in this same group is reduced to sixty-six percent and Live Nation becomes the second largest ticketer with a sixteen percent share – more than four times larger than Tickets.com.

38.    The market for primary ticketing for major concert venues is highly concentrated. The proposed merger will further increase the degree of concentration to levels raising serious antitrust concerns as described in the *Horizontal Merger Guidelines* issued by the Department of Justice and the Federal Trade Commission. *Id.* § 1.51.

39.    Using a measure of market concentration called the Herfindahl-Hirschman Index ("HHI"), defined and explained in Appendix A, the post-acquisition HHIs increase by over 2,190 points, resulting in a post-acquisition HHI of over 6,900.

14

40.    The merger of Ticketmaster and Live Nation would eliminate Live Nation's competitive presence in the market for the provision of primary ticketing services for major concert venues, resulting in less aggressive competition, less pressure on the fees earned by Ticketmaster, and less innovation for venues and fans than would exist absent the merger. The proposed merger came at a time when Live Nation was just starting to make a competitive impact. Live Nation's ability to begin to attract third-party venues and stated intentions to compete on price likely would have resulted in increasingly competitive pricing and better services to major concert venues and consumers in the future. The proposed merger is likely to lessen competition for primary ticketing services for major concert venues.

41.    The proposed merger will also reduce the merged firm's incentive to innovate and improve their respective primary ticketing services. Ticketing innovations are less likely to occur in a post-merger world in which Ticketmaster's dominance will continue and Live Nation's ticketing service has been shuttered. Notably, the benefits of quality enhancements and product variety that flow from experimentation would be far less likely to take place.

## VII. ABSENCE OF COUNTERVAILING FACTORS

42.    Supply responses from competitors or potential competitors will not prevent likely anticompetitive effects of the proposed merger. The merged firm would possess significant advantages that any new or existing competitor would have to overcome to successfully compete with the merged firm.

43.    Ticketmaster has historically possessed competitive advantages. As a result, small ticketing firms have been limited in their ability to compete. With the merger, additional entry barriers are emerging. The merged firm's promotion and artist management businesses

15

provide an additional challenge that small ticketing companies will now have to overcome. The ability to use its content as an inducement was the point that Live Nation touted as the basis on which Live Nation could challenge Ticketmaster in ticketing.

44.    No existing ticketing company or likely entrant possesses the combination of attributes to prevent the selective exercise of market power over the major concert venues by the merged firm. New entry into the provision and sale of primary ticketing services is costly and time-consuming. Major concert venues require primary ticketing services to be provided in the United States by service personnel located in the United States.  It would take a new entrant a substantial investment of money and over two years to develop the combination of comparable characteristics necessary to compete with the merged firm in primary ticketing. New entry is not likely to occur in a timely or sufficient basis to prevent the anticompetitive effects that would otherwise result from the merger of Ticketmaster and Live Nation.

## VIII.  VIOLATION ALLEGED

*(Violation of Section 7 of the Clayton Act)*

45.    The United States and the Plaintiff States incorporate the allegations of paragraphs 1 through 44 above.

46.    The proposed merger of Ticketmaster and Live Nation would likely substantially lessen competition in interstate trade and commerce in violation of Section 7 of the Clayton Act in the provision and sale of primary ticketing services for major concert venues. 15 U.S.C. § 18.

47.    The proposed merger threatens to reduce competition in a number of ways, including, among others:

a.    eliminating the head-to-head competition between the merging parties;

16

b. reducing the incentives of the merging parties to innovate and improve their primary ticketing services, including the loss of the increased opportunity for innovation from a firm engaged in experimentation in primary ticketing;

c. impairing the ability of venue customers to benefit from competition between these firms, including competition based on price, terms, quality, service, and innovation; and

d. impairing the ability of consumers to benefit from competition between these firms, including competition based on price, terms, quality, service, and innovation.

48. The proposed merger of Ticketmaster and Live Nation likely will have the following effects:

a. actual and potential competition between Ticketmaster and Live Nation in the provision and sale of primary ticketing services for major concert venues will be eliminated; and

b. competition generally in the market for primary ticketing for major concert venues would be substantially lessened.

## REQUESTED RELIEF

49. The United States and the Plaintiff States request that:

a. the proposed merger of Ticketmaster and Live Nation be adjudged to violate Section 7 of the Clayton Act, 15 U.S.C. § 18;

17

b.   Ticketmaster and Live Nation be enjoined from carrying out the proposed merger or carrying out any other agreement, understanding, or plan by which Ticketmaster and Live Nation would acquire, be acquired by, or merge with each other;

c.   the United States and Plaintiff States be awarded their costs of this action;

d.   the Plaintiff States be awarded their reasonable attorneys' fees; and

e.   the United States and Plaintiff States receive such other and further relief as the case requires and the Court deems just and proper.

Dated: January 25, 2010

Respectfully submitted,

FOR PLAINTIFF UNITED STATES:

CHRISTINE A. VARNEY (DC 411654)
Assistant Attorney General

WILLIAM F. CAVANAUGH, JR.
Deputy Assistant Attorney General

J. ROBERT KRAMER II
Director of Operations

JOHN R. READ (DC 419373)
Chief
DAVID C. KULLY (DC 448763)
Assistant Chief

AARON D. HOAG
Attorney
U.S. Department of Justice
Antitrust Division
450 Fifth Street, N.W., Suite 4000
Washington, D.C. 20530
Telephone: (202) 514-5038
Fax: (202) 514-7308
Email: aaron.hoag@usdoj.gov

ANN MARIE BLAYLOCK (DC 967825)
PAM COLE
ANDREW J. EWALT (DC 493433)
TIMOTHY T. FINLEY (DC 471841)
KERRIE J. FREEBORN (DC 503143)
ETHAN C. GLASS
CHRISTOPHER HARDEE (DC 458168)
WILLIAM H. JONES II
JACKLIN CHOU LEM
CREIGHTON J. MACY
MARY BETH MCGEE (DC 358694)
LISA SCANLON
CLAUDE F. SCOTT, JR. (DC 414906)
JOHN M. SNYDER (DC 456921)
LAUREN SUN (DC 991508)
JENNIFER A. WAMSLEY (DC 486540)
WEEUN WANG
CHRISTINA M. WHEELER
Attorneys for the United States

**FOR PLAINTIFF STATE OF ARIZONA**
TERRY GODDARD
Attorney General
State of Arizona

NANCY M. BONNELL
AZ Bar # 016382
Antitrust Unit Chief
Consumer Protection & Advocacy Section
1275 West Washington
Phoenix, AZ 85007
Tel: (602) 542-7728
Fax: (602) 542-9088
Email: Nancy.Bonnell@azag.gov

**FOR PLAINTIFF STATE OF ARKANSAS**

DUSTIN McDANIEL
Attorney General
State of Arkansas

David A. Curran
Arkansas Bar No. 2003031
Assistant Attorney General
323 Center St., Suite 200
Little Rock, AR 72201
Tel:  (501) 682-3561
Fax:  (501) 682-8118
Email:  david.curran@arkansasag.gov

**FOR PLAINTIFF STATE OF CALIFORNIA**

EDMUND G. BROWN JR., Attorney General
of the State of California

KATHLEEN FOOTE,
Sr. Assistant Attorney General

PAULA LAUREN GIBSON, State Bar No. 100780
Deputy Attorney General
California Office of the Attorney General
300 So. Spring Street, Suite 1702
Los Angeles, CA 90013
Tel: (213) 897-0014
Fax: (213) 897-2801
Email: Paula.Gibson@doj.ca.gov

**FOR PLAINTIFF STATE OF FLORIDA**
BILL McCOLLUM
Attorney General
State of Florida

PATRICIA A. CONNERS
Associate Deputy Attorney General
LIZABETH A. BRADY
Chief, Multistate Antitrust Enforcement
LISA ANN MCGLYNN
Assistant Attorney General
ANTITRUST DIVISION
PL-01; The Capitol
Tallahassee, FL 32399-1050
Tel: (850) 414-3300
Fax: (850) 488-9134
Email: Lisa.McGlynn@myfloridalegal.com

**FOR PLAINTIFF STATE OF ILLINOIS**
LISA MADIGAN, Attorney General

By: Robert W. Pratt
Chief, Antitrust Bureau
Office of the Attorney General
State of Illinois
100 West Randolph Street
Chicago, Illinois 60601
Tel: (312) 814-3722
Fax: (312) 814-4209
Email: RPratt@atg.state.il.us

**FOR PLAINTIFF STATE OF IOWA**
Thomas J. Miller
Attorney General of Iowa

Layne M. Lindebak
Assistant Attorney General
Special Litigation Division
Iowa Department of Justice
Hoover Office Building-Second Floor
1305 East Walnut Street
Des Moines, Iowa 50319
Tel: (515) 281-7054
Fax: (515) 281-4902
Email: Layne.Lindebak@iowa.gov

**FOR PLAINTIFF STATE OF LOUISIANA**
JAMES D. "BUDDY" CALDWELL
Attorney General
State of Louisiana


STACIE L. DEBLIEUX
LA Bar # 92142
Assistant Attorney General
Public Protection Division
1885 North Third St.
Baton Rouge, LA 70802
Tel: (225) 326-6400
Fax: (225) 326-6499
Email: deblieuxs@ag.state.la.us




**FOR PLAINTIFF COMMONWEALTH OF MASSACHUSETTS**
MARTHA COAKLEY
ATTORNEY GENERAL

By:
William T. Matlack, BBO #552109
Chief, Antitrust Division
Matthew M. Lyons, BBO #657685
Assistant Attorneys General
Office of Attorney General Martha Coakley
One Ashburton Place
Boston, MA 02108
Tel: (617) 727-2200
Fax: (617) 727-5765
Email: William.Matlack@state.ma.us
Email: Matthew.Lyons@state.ma.us

**FOR PLAINTIFF STATE OF NEBRASKA**
JON BRUNING
Attorney General
State of Nebraska


Leslie Campbell-Levy
Assistant Attorney General
Chief, Consumer Protection & Antitrust
Nebraska Department of Justice
2115 State Capitol
Lincoln, NE  68509
Tel: (402) 471-2811
Fax: (402) 471-2957
Email: leslie.levy@nebraska.gov


**FOR PLAINTIFF STATE OF NEVADA**
CATHERINE CORTEZ MASTO
Attorney General
ERIC WITKOSKI
Consumer Advocate and Chief Deputy Attorney General


By:     BRIAN ARMSTRONG
Senior Deputy Attorney General
State of Nevada, Office of the Attorney General
Bureau of Consumer Protection
555 E. Washington Ave., Suite 3900
Las Vegas, Nevada 89101
Tel: (702) 486-3420
Fax: (702) 486-3283
Email: antitrust@ag.nv.gov

**FOR PLAINTIFF STATE OF OHIO**

RICHARD CORDRAY
ATTORNEY GENERAL

Jennifer L. Pratt
Chief, Antitrust Department
Patrick E. O'Shaughnessy (D.C. Bar # 494394)
Senior Assistant Attorney General
150 E. Gay St., 23rd Floor
Columbus, OH 43215
Tel: (614) 466-4328
Fax: (614) 995-0266
Email: jennifer.pratt@ohioattorneygeneral.gov
        patrick.o'shaughnessy@ohioattorneygeneral.gov

FOR PLAINTIFF STATE OF OREGON
JOHN R. KROGER
Attorney General of Oregon

By:  Caren Rovics, OSB# 901491
Senior Assistant Attorney General
Financial Fraud/Consumer Protection Section
Civil Enforcement Division
1162 Court Street NE
Salem, OR 97301-4096
Tel: (503) 934-4400
Fax: (503) 378-5017
Email: caren.rovics@doj.state.or.us

**FOR PLAINTIFF COMMONWEALTH OF PENNSYLVANIA**
TOM CORBETT
Attorney General

By: _James A. Donahue III by JAT_
James A. Donahue, III
Chief Deputy Attorney General
PA Bar No. 42624

Jennifer A. Thomson
PA Bar No. 89360

Norman W. Marden
PA Bar No. 203423

Joseph S. Betsko
PA Bar No. 82620
Deputy Attorneys General

Office of Attorney General
Antitrust Section
14th Floor Strawberry Square
Harrisburg, PA 17120
Tel: (717) 787-4530
Fax: (717) 705-7110
E-mail: jdonahue@attorneygeneral.gov
E-mail: jthomson@attorneygeneral.gov
E-mail: nmarden@attorneygeneral.gov
E-mail: jbetsko@attorneygeneral.gov

STATE OF RHODE ISLAND
By Its Attorney

PATRICK C. LYNCH
Attorney General
State of Rhode Island
150 South Main Street
Providence, Rhode Island 02903
(401) 274-4400
(401) 222-2995
plynch@riag.ri.gov

FOR PLAINTIFF STATE OF TENNESSEE

Robert E. Cooper, Jr.
Attorney General and Reporter
Victor J. Domen, Jr.
Senior Counsel
State of Tennessee
Office of the Tennessee Attorney General
Consumer Advocate and Protection Division
425 Fifth Avenue North
Nashville, TN  37243
Tel: (615) 532-5732
Fax: (615) 532-2910
Email: Vic.Domen@ag.tn.gov

**FOR PLAINTIFF STATE OF TEXAS**
GREG ABBOTT
Attorney General of Texas

C. ANDREW WEBER
First Assistant Attorney General

DAVID S. MORALES
Deputy Attorney General for Civil Litigation

JOHN T. PRUD'HOMME
Assistant Attorney General
Acting Chief, Antitrust Division

David M. Ashton
Assistant Attorney General
State Bar No.  24031828
Office of the Attorney General
300 W. 15th Street
Austin, Texas  78701
Tel: (512) 936-1781
Fax: (512) 320-0975
Email: david.ashton@oag.state.tx.us

**FOR PLAINTIFF STATE OF WISCONSIN**

J.B. VAN HOLLEN
ATTORNEY GENERAL
STATE OF WISCONSIN

By:

GWENDOLYN J. COOLEY
WI Bar #1053856
Assistant Attorney General
Wisconsin Department of Justice
17 West Main Street
Madison, WI 53703
Telephone: (608) 261-5810
Fax: (608) 267-2778
Email: cooleygj@doj.state.wi.us

## Appendix A

## DEFINITION OF HHI

The term "HHI" means the Herfindahl-Hirschman Index, a commonly accepted measure of market concentration. The HHI is calculated by squaring the market share of each firm competing in the market and then summing the resulting numbers. For example, for a market consisting of four firms with shares of 30, 30, 20, and 20 percent, the HHI is 2,600 ($30^2 + 30^2 + 20^2 + 20^2 = 2,600$). The HHI takes into account the relative size and distribution of the firms in a market. It approaches zero when a market is occupied by a large number of firms of relatively equal size and reaches its maximum of 10,000 when a market is controlled by a single firm. The HHI increases both as the number of firms in the market decreases and as the disparity in size between those firms increases.

Markets in which the HHI is between 1000 and 1800 are considered to be moderately concentrated, and markets in which the HHI is in excess of 1800 points are considered to be highly concentrated. Transactions that increase the HHI by more than 100 points in highly concentrated markets presumptively raise significant antitrust concerns under the Department of Justice and Federal Trade Commission 1992 Horizontal Merger Guidelines.

## CERTIFICATE OF SERVICE

I, Aaron Hoag, hereby certify that on January 25, 2010, I caused a copy of the Complaint

and attached Exhibits to be served on defendants Ticketmaster Entertainment, Inc., and Live

Nation, Inc., by mailing the documents via email to the duly authorized legal representatives of

the defendants, as follows:

FOR TICKETMASTER ENTERTAINMENT, INC.
M. Sean Royall, Esq.
Gibson, Dunn & Crutcher LLP
1050 Connecticut Avenue, NW
Washington, DC 20036
Tel: (202) 955-8546
Fax: (202) 467-0539
Email: SRoyall@gibsondunn.com

FOR LIVE NATION, INC.
Michael Egge, Esq.
Latham & Watkins LLP
555 Eleventh Street, NW
Washington, D.C. 20004
Tel: (202) 637-2200
Fax: (202) 637-2201
Email: michael.egge@LW.com

Aaron D. Hoag, Esq.
Attorney
U.S. Department of Justice
Antitrust Division
450 Fifth Street, N.W., Suite 4000
Washington, D.C. 20530
Telephone: (202) 514-5038
Fax: (202) 514-7308
Email: aaron.hoag@usdoj.gov

30